**ACTIVE PRODUCTS CORPORATION, et al., Plaintiffs,**

**v.**

**A.H. CHOITZ & CO. INC. d/b/a Industrial Construction Equipment, et al., Defendants.**

**Civ. No. 1:95–CV–231.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 22, 1995.

C. Erik Chickedantz, Hawk Haynie Gall-meyer and Chickedantz, Fort Wayne, IN, John Fehrenbach, William N. Hall, Whitman Breed Abbott and Morgan, Washington, DC, for Active Products Corp.

### THE CASE MANAGEMENT ORDER

WILLIAM C. LEE, District Judge.

#### I. Preamble

On July 19, 1995, a 131–page complaint under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, was filed by twenty-three (23) named plaintiffs on behalf of themselves and some sixty-six (66) other parties who had assigned their rights to the named plaintiffs. Named as defendants are 1,181 individual and corporate entities. The caption of the cause alone spans some twenty-one and one-half (21½) pages, single spaced. Even among "Superfund" cases, this action is very substantial, *compare United States v. Kramer,* 770 F.Supp. 954, 960 (D.N.J.1991) (50 primary defendants and approximately 300 third party defendants); *New York v. Exxon Corp.,* 744 F.Supp. 474, 479 (S.D.N.Y.1990) (15 primary corporate defendants and approximately 300 third party defendants); *United States v. Stringfellow,* 661 F.Supp. 1053, 1055–58 (C.D.Cal.1987) (more than 100 parties),[1] particularly when one considers that as the action is presently pending, it accounts only for the primary defendants and does not take into account the possibility of third- and fourth-party complaints against other potentially responsible parties.

The number of parties in this case parallels that of *In re: San Juan Dupont Plaza Hotel Fire Litigation,* 1989 WL 168401, 1988 U.S.Dist. LEXIS 17332 (D.P.R. Dec. 2, 1988), a case in which 273 complaints had been filed on behalf of some 2,337 plaintiffs. As in that case, the logistics involved in managing this litigation, which involves such a large array of parties, leads this Court to conclude that a detailed Case Management Order needs to be entered.[2] The need for such an Order, apart from the salutary purpose of managing what promises to be time-consuming litigation, arises from the fact that while this case is pending, this Court must still maintain its regular docket and provide all other litigants in this Court with prompt and efficient consideration.[3] It is the intention of this Court that while this case is pending, all other cases in this Court will receive the same timely attention they would have received had this action not been filed. In this respect, all litigants in this Court will be placed on equal footing with no case overwhelming the facilities of the Court.

The Fort Wayne Division of the United States District Court for the Northern District of Indiana serves as venue for twelve contiguous counties in northeastern Indiana. 28 U.S.C. § 94(a)(1). It is served by one United States District Judge and one United States Magistrate Judge, the latter of which also has responsibilities with another division in the Northern District of Indiana. This division's Clerk's office is presently staffed by four deputy clerks.

Rule 1 of the Federal Rules of Civil Procedure states the that federal rules "shall be construed and administered to secure the

1. These cases were cited in the *Manual for Complex Litigation, Third,* § 33.7 (1995) [hereinafter "*MCL*"] (noting that a Superfund case may involve scores of defendants and third-party defendants, with numerous counterclaims and cross claims seeking indemnification and contribution).

2. As noted in the *Manual for Complex Litigation, Third,* Rules 16, 26, 37, 42, and 83 of the Federal Rules of Civil Procedure contain numerous grants of authority that supplement the court's inherent power to manage litigation. Specifically, Fed.R.Civ.P. 16(c)(12) authorizes judges to

adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." *MCL,* § 20.1.

3. In this case, the Court finds it necessary to enter this Order prior to the preliminary pre-trial conference because of the multiplicity of parties and the resulting confusion, delay, and extra costs that would otherwise occur should the Court wait to enter such an Order.

*just, speedy, and inexpensive determination of every action."* Fed.R.Civ.P. 1. (emphasis added). The Advisory Committee Notes to Rule 1 discuss the 1993 addition of the words "and administered," stating that, "[t]he purpose of this revision ... is to recognize the affirmative duty of the court to exercise the authority conferred by these rules *to ensure that civil litigation is resolved not only fairly, but also without undue cost or delay."* Notes of Advisory Committee on Rules, 1993 Amendment, Fed.R.Civ.P. 1 (emphasis added). It is with these words in mind that this Case Management Order is entered.

In calendar year 1994, 387 civil cases were filed in the Fort Wayne Division along with 53 criminal cases for a total of 440 cases. This caseload is approximately at the median of United States District Courts. With respect to the annual caseload of the court, it is estimated that approximately 1500 to 2000 litigants pass through this Court annually. Based on this computation, this case alone, as presently styled, would account for well over one-half of this Court's annual business.

Despite the number of cases filed, this Court has been able to maintain a current docket. More than 95% of the cases in this Court are fully and finally resolved within one year of the date of filing. As for the motions practice in this Court, fully 90% of all substantive motions are decided within thirty (30) days of the date they become ripe for consideration.

During the pendency of this litigation, this Court intends to provide the same level of service to the litigants as it has in the past. That is, this Court has no intention of allowing this case to overwhelm all of the Fort Wayne Division's energy and resources. Such a situation would not be fair to the other litigants in this Court. Accordingly, this litigation must be managed in a manner which most efficiently utilizes the limited resources of this Court for all of the litigants which appear before it.

This is the second "Superfund" case this Court has managed. In 1989,[4] an action styled *United States of America v. SCA Services of Indiana, Inc.,* Cause No. 89–29, ("*SCA*") was filed. At the time of the filing there were two named plaintiffs and one defendant. Now, in addition to the original parties, there are 95 third-party defendants and 129 fourth-party defendants. All totalled, there are 227 parties involved in *SCA.* Although extremely large in its own right, the *SCA* case, by sheer number of parties alone, is approximately one-sixth the size of this action. The *SCA* case has taken an extraordinary amount of this Court's attention. The amount of time spent by the judicial officers of this Court on the *SCA* litigation is substantial. To date, it is conservatively estimated that 1200 hours have been expended on that case by the District Judge and Magistrate Judge. In terms of costs to the taxpayers, that would translate into $1,003,200.00 (1200 hours × $836.00).[5]

In addition, the Clerk's office has devoted much time to the *SCA* case. As of this time, the docket has approximately 1900 entries and spans over 180 pages. There are presently in the Clerk's office 49 volumes of filings, each inches thick, covering in excess of ten linear feet of file drawer space. The filings do not take into account discovery or documentary exhibits; indeed, two different document depositories have been instituted, one for the third-party defendants and the other for the fourth-party defendants. This Court can only speculate as to the amount of

**4.** While *SCA* carries a 1989 filing date, it should be noted that the initial filing related to a notice of a cleanup. The actual litigation did not commence until the filing of the third-party complaint, which was not filed until September of 1992. Even given the magnitude of that case, the Court was still able to set the matter for trial in October of 1995, slightly over three years after the litigation was at issue.

**5.** In *Dominguez v. Figel,* 626 F.Supp. 368, 374 (N.D.Ind.1986), this court noted that in 1985, a single hour spent by a federal judge on a case

cost the taxpayers $600.00 (citing Levin & Colliers, *Containing the Cost of Litigation,* 37 *Rutg. L.Rev.* 219, 227 (1985)). Since that time, it is assumed that this cost would have risen at approximately the same rate as the cost of living, which, based upon the Consumer Price Index, has increased yearly by the following rates: 1986, +1.9%; 1987, +3.7%; 1988, +4.1%; 1989, +4.8%; 1990, +5.4%; 1991, +4.2%; 1992, +3.0%; 1993, +3.0%; 1994, +2.6%. Thus, $600.00 in 1985 is the equivalent of $836.00 today.

time and space those filings consumed, but it is presumed that they were extraordinary.

In many respects, *SCA* has been a learning experience. Many of those lessons will be applied to this case. One such lesson is that this Court does not have either the manpower or resources to manage this case in the traditional fashion. The *SCA* case, involving far fewer participants, stretched this Court's resources to its limits. Employing such traditional methods in a case of this size would stretch the resources of the Clerk's office and the judicial officers beyond the breaking point.

An equally important lesson from the *SCA* litigation relates to the virtual impossibility of counsel for the litigants to utilize traditional methods in effecting service on the other parties. In this respect, liaison counsel were utilized so that each document did not have to be served on all opposing counsel. It is expected that in this case it would be cost prohibitive for service to be made in the traditional manner, particularly considering the fact that many of the named defendants may have relatively small exposure. If traditional methods were utilized, it would not take long for the costs to quickly exceed the potential liability of many of the defendants.[6]

It would be impossible for this Court to manage a case of this magnitude utilizing traditional methods and preserve any kind of currency for the rest of its docket while also providing the litigants in this case a prompt and cost-effective administration. Accordingly, this Court will employ a panel of special masters and an electronic filing, docketing, and service system to assist in the administration of this case. Both the use of the electronic filing, docketing, and service system and the special masters will be explained below.

## II. Complex Litigation Automated Docket (CLAD)

### A. Introduction

■ This case will utilize a system of electronic filing and service known as Complex Litigation Automated Docket (CLAD).[7] CLAD is a system that provides for the electronic filing and retrieval of full-text pleadings and related documents. CLAD has been used in several complex cases to significantly reduce the time typically required by the Court and lawyers to store and distribute filings by essentially creating a paperless docket and file.[8]

CLAD is being used successfully in a complex DES product liability case currently being litigated in the Northern District of Ohio. In the Ohio case, attorneys pay $18.00 to file each document and $.15 per page for text downloaded into their own computers. "Electronic Dockets as Wave of Future," *Lawyers Weekly USA*, June 19, 1995, at B4. Robin Weaver, lead defense counsel in the case, noted, "It's an unbelievable convenience. Before we got it, sending a simple notice of deposition to 200 people cost $3,000 and tied up my secretary for an entire afternoon. Now it costs $18 and takes a couple of minutes." *Id.* In addition to the filing cost

---

6. In fact, with respect to some of the defendants, using traditional methods of filing and service could result in the costs instantaneously exceeding a defendant's potential liability. *See, e.g., infra* note 23.

7. CLAD is produced by the LEXIS–NEXIS division of Mead Data Central.

8. This court takes notice that CLAD already has been implemented in several courts. For example, in 1991 the Delaware Superior Court used CLAD for complex insurance litigation that involved 11 cases and more than 100 law firms. In July of 1994, the U.S. Bankruptcy Court used the system for the Macy's Department Store bankruptcy. In February of 1995, the U.S. District Court for the Northern District of Ohio began using CLAD for DES product liability litigation. In May of 1995, the state court in Fulton County, Georgia, began using the system in a complex environmental liability case that involves more than 500 plaintiffs and 25 defendant corporations. "Electronic Dockets as Wave of Future," *Lawyers Weekly USA*, June 19, 1995, at B4.

Additionally, two other courts have recently decided to utilize CLAD in current litigation. Cook County Circuit Court in Chicago, Illinois, will be using CLAD in *Amoco Chemical Co., et al. v. Lloyd's of London, et al.*, Case No. 93–L–8484, and *Emerson Electric Co., et al. v. Aetna Casualty & Surety Co., et al.*, Case No. 93–CH–2566. Ramsey County, Minnesota, will be using CLAD in *State of Minnesota, et al. v. Phillip Morris, Inc., et al.*, Case No. C1–94–8565.

benefits, advantages of the system include, among others, the following:

- ● providing instant access to the full text of the case docket;
- ● reducing or eliminating hardcopy filing and retrieval costs;
- ● establishing an electronic database of filings for conducting computer-assisted legal research;
- ● enhancing communications by enabling the Judge to issue orders and decisions· electronically;
- ● providing users with option for automatic fax "notification of filing" service; and
- ● allowing more focus on legal issues by eliminating the administrative burdens.

Users of CLAD need to have a personal computer, modem, and phone line. When Court-authorized users wish to file a document with the Court, they simply access the CLAD toll-free telephone number and enter their CLAD filing ID and password. A series of on-screen prompts leads the user through the filing process. Filings are available immediately to all authorized users. Because filing pleadings, briefs, and other documents requires masses of paper, reducing paper ultimately means more efficient management of the court's docket and the attorneys' case. An electronic system means that authorized users can file documents easily and sort through a large volume of materials to locate specific information, enabling lawyers to spend more time "lawyering" and less time managing paper.

To simplify the filing process, the computer leads the way by asking a series of questions or giving prompts. Basically, the user enters an ID number and a name for the document to be filed. The user then sends the document from the user's personal computer in a pre-determined format, such as WordPerfect or ASCII. After confirmation, the filing is instantly available.

Users will be provided with free training and toll-free customer service. CLAD can be accessed at anytime and from any loca-

tion. As noted earlier, all the users need is a personal computer, modem, phone line, and CLADTRAN software, which is provided to users free of charge.[9] Users incur costs for filing documents ($4 to $25 per document), downloading documents ($.15 to $.55 per page), and the optional fax notification service ($.50 per page; notices generally one page in length). Additional costs can be incurred for counsel using the Private Database to conduct LEXIS-type searches ($12 per search) and downloading such documents ($2 per document to download/print).[10]

Utilizing CLAD in this litigation is in keeping with the spirit of Rule 1 of the Federal Rules of Civil Procedure, which emphasizes the importance of the "just, speedy, and inexpensive determination of every action." Fed. R.Civ.P. 1. CLAD will be a great boon to all attorneys involved in this case. Further, CLAD will enable the court to operate most efficiently and will relieve the Clerk's small staff (whose resources are already stretched to the limit) from thousands of hours of work. In fact, if CLAD is not used in the present action, it is clear that additional personnel will need to be hired simply to handle all of the filings that are necessary in a case of this magnitude.

In spite of all of the obvious advantages to everyone using CLAD, this Court is aware that concerns have been expressed with regard to its use of CLAD. These concerns have primarily arisen with respect to Rule 79 of the Federal Rules of Civil Procedure which provides that the Clerk of the Court keep a "civil docket." It has been suggested that if the docket is kept automatically by the CLAD system, rather than manually by the Clerk's office, the Clerk may be subject to some form of liability if, for example, a document is not filed or is filed incorrectly.

Additionally, concerns have been expressed regarding 28 U.S.C. § 1914, which prescribes the fees which the Clerk may collect. The specific concern is that, even though the Clerk does not actually collect the

---

**9.** *Pro se* litigants and members of the public will have access to all court records on CLAD, without charge, through a public terminal in the Clerk's office.

**10.** Precise charges will be determined at a later date, before parties will need to begin using the system.

fees that are paid for the use of CLAD (LEXIS/NEXIS charges and collects all relevant fees), the implication might arise that the Clerk is exceeding his statutory authority.

This court considers the above concerns to be, at most, *de minimis.* Rule 79 does not prohibit use of an electronic filing system, and Rule 5(e) specifically envisions such a system of filing. The Judicial Conference has not yet formally spoken on the matter; thus, any standards adopted by this court cannot possibly contradict the Conference.[11] Moreover, Rule 1 of the Federal Rules of Civil Procedure instructs that the Rules are to be construed and administered "to secure the just, speedy, and inexpensive determination of every action." The only possible way for this court to remain in compliance with Rule 1 in this action is for the CLAD system to be instituted.

Likewise, the matter of collecting fees appears to be a non-issue. The miscellaneous fees (such as copying fees) discussed in § 1914 have been put in place to prevent the public from taking undue advantage of the staff of the Clerk's office by making frivolous or overburdensome requests. The CLAD system will actually facilitate the functioning of the Clerk's office and the ability of the parties and counsel to secure information. Furthermore, the Clerk is not collecting any

fees in relation to CLAD, as LEXIS/NEXIS collects such fees.[12]

Nevertheless, in an effort to address the concerns discussed above, this court will solicit the consent of all parties to this case to the use of CLAD as the formal, official docket, and a waiver of any claims against the Clerk of the Court (or his staff) that may arise out of the use of CLAD. The failure of any party to object to the use of CLAD before the April 18, 1996 pretrial conference will be found to be both a consent to its use and a waiver of any and all claims against the Clerk of the Court.[13] All waivers will apply throughout the entire course of this litigation as well as to appeals and certified records.

### B. Information About Participating in CLAD

TO RECEIVE INFORMATION ABOUT CLAD, PARTIES SHOULD CALL RON TATEMAN OR GARY DAVIS AT LEXIS–NEXIS. THEY CAN BE REACHED AT 1–800–227–9597. Detailed free training will be provided at or near the time when there will be a need to use the system.

### C. Technical Requirements

The technical requirements for using CLAD are very basic. To access CLAD, it is necessary to have a computer operating un-

11. Although Rule 5(e) permits the use of electronic filing "consistent with standards established by the Judicial Conference," the Judicial Conference has not yet established any standards for electronic filing. It is worth noting that, with respect to real-time court reporting, court reporters have developed their own standards in the absence of guidance from the Judicial Conference. This approach appears to be working well, and gives the Judicial Conference the added benefit of practical experience before establishing formal standards.

12. The Delaware Supreme Court addressed objections to the use of CLAD in *In re White Lung Association,* 1994 WL 91257, 1994 Del. LEXIS 95 (March 16, 1994), and found that the objections were not well-taken. Responding to the argument that members of the public would be denied access to public records unless a special fee was paid to Mead, the court noted that members of the public were permitted access to all court records on CLAD by the Prothonotary without charge. *Id.* at *2, 1994 Del. LEXIS 95,

at *5. The court also held that the CLAD contract awarded to Mead did not violate the state competitive bidding statute. *Id.* In rejecting the argument that CLAD improperly restricts the practice of law, the court stated, "The use of computers to access information is a commonplace feature of modern law office operation. If the court system is to be able to respond to the demands of complex litigation, parties and their counsel who seek the intervention of the judicial system may be required to incur the reasonable expenses of participation in the modern information systems." *Id.*

13. Objections, if any, to the use of CLAD shall be presented in counsels' reports that are to be submitted to the Court by March 15, 1996. *See infra* p. 288. Defendants wishing to voice objections shall do so to the Defense Steering Committee Chair within sixty (60) prior to the April 18, 1996 conference. The Chair shall then include the list of objectors and reasons for objecting in the report to the Court. Likewise, plaintiffs who object shall be enumerated in the plaintiffs' counsel's report to the Court.

der a DOS operating system and equipped with a Hayes compatible modem. Each attorney having access to CLAD for the purpose of filing and retrieving documents must have a computer equipped with a hard disc drive.

NOTE: CLAD WILL NOT BE UTILIZED UNTIL MAY 17, 1996, AFTER THE CLOSE OF THE INFORMAL SETTLEMENT STAGE. THUS, PARTIES HAVE SUFFICIENT TIME TO LEARN ABOUT CLAD BEFORE THE SYSTEM IS OPERATIONAL. FREE TRAINING WILL BE PROVIDED BY LEXIS/NEXIS, INCLUDING A SESSION TO BE HELD AT THE APRIL 18, 1996 PRETRIAL CONFERENCE.

### III. SPECIAL MASTERS

The appointment and compensation of masters is governed by Rule 53(a) of the Federal Rules of Civil Procedure which states:

> The court in which any action is pending may appoint a special master therein. As used in these rules, the word "master" includes a referee, an auditor, an examiner, and an assessor. The compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund .or subject matter of the action, which is in the custody and control of the court as the court may direct; provided that this provision for compensation shall not apply when a United States magistrate judge is designated to serve as a master. The master shall not retain the master's report as security for the master's compensation; but when the party ordered to pay the compensation allowed by the court does not pay it after notice and within the time prescribed by the court, the master is entitled to a writ of execution against the delinquent party.

Reference to a master is governed by Rule 53(b), which states:

> A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it. Upon the consent of the parties, a magistrate judge may be designated to serve as a special master without regard to the provisions of this subdivision.

■ Courts have the "inherent power to provide themselves with appropriate instruments for the performance of their duties, including the authority to appoint persons unconnected with the court, such as special masters, auditors, examiners and commissioners, with or without consent of the parties, to simplify issues and to make tentative findings." *Ex parte Peterson,* 253 U.S. 300, 314, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920); *Reilly v. United States,* 863 F.2d 149, 154, n. 4 (1st Cir.1988). The outer boundaries of Rule 53 authority are established by Article III and the due process clause of the Constitution. The Supreme Court has indicated that the exercise of essential judicial functions by personnel who are not Article III judges (*i.e.,* masters, arbitrators, administrative judges, bankruptcy judges) is not prohibited if the benefits of appointing such persons—efficiency and expertise—outweigh the diminution of Article III values—neutral, independent adjudication. *Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 849–51, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986); *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 582–84, 105 S.Ct. 3325, 3334, 87 L.Ed.2d 409 (1985); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

■ Of course, the parties to a civil case may consent to the appointment of a master under any circumstance, just as litigants may waive their personal right to have an Article III judge preside over a civil trial. *Peretz v. United States,* 501 U.S. 923, 935–37, 111 S.Ct. 2661, 2669, 115 L.Ed.2d 808 (1991); *Mobil Oil Corp. v. Altech Industries, Inc.;* 117 F.R.D. 650 (C.D.Cal.1987); *Goldstein v. Kelleher,* 728 F.2d 32, 35 (1st Cir.1984).

■ Courts have routinely appointed special masters for various tasks: discovery

masters, case managers, settlement masters, fact finders, expert advisors, remedial masters, monitors, claims evaluators, etc. In the present case, the use of masters for settlement and fact-finding purposes is clearly justified. Of the 1200 judicial hours devoted to *SCA* to date, approximately 500 hours have been spent by Magistrate Judge Cosbey in settlement efforts.

In many circuits, reference to masters is becoming more frequent as courts are confronted with huge environmental law and mass tort litigation. For example, in *In re Armco, Inc.,* 770 F.2d 103 (8th Cir.1985), a CERCLA case, the Eighth Circuit held that the district court acted properly in granting to a master broad authority to supervise and conduct pretrial matters, including discovery activities, the production and arrangement of exhibits and stipulations of fact, the power to hear motions for summary judgment or dismissal and to make recommendations with respect thereto. *Id.* at 105.

Other courts have allowed special masters to have even broader powers than the ones in *Armco.* In *United States v. Hardage,* 26 Env't Rep.Cas. (BNA) 1042, 1045–47 (W.D.Okla.1987), the district court allowed the master to review dispositive pretrial motions, hold trial, and recommend findings of fact and conclusions of law on the proposed injunctive relief for the cleanup that was sought. In *Hardage,* the United States filed a petition for mandamus in the Tenth Circuit Court of Appeals, seeking a ruling that the court had abused its discretion and abdicated its judicial functions by appointing a special master to oversee these dispositive aspects of the case. The Tenth Circuit dismissed the petition without comment. *In re United States,* 1987 HWLR 11,487 (10th Cir. Aug. 19, 1987).

Recently, many courts have expressly appointed special masters to achieve settlements in complex litigation. *See, e.g., In re Joint Eastern and Southern Districts Asbestos Litigation,* NYAL CV 87–1383, CV–87–2273 (E. & S.D.N.Y.1991); *In re DES Cases,* CV 91–3784, Misc. 91–456 (E.D.N.Y.1992). Encouraged by the 1983 amendments to Rule 16(a) to facilitate settlement of the case, federal judges are permitted to "take action with respect to ... [extraordinary] procedures to resolve disputes." Fed.R.Civ.Proc. 16(a), (c).

Rule 53(b) anticipates the appointment of masters to make recommended factual findings going to the merits of the dispute before the court. Thus, it provides that in actions presenting complicated issues for the jury or exceptional conditions, masters may require the production of evidence, hold formal hearings at which the rules of evidence apply, issue subpoenas, administer oaths, and create a record for review. Although special masters are more frequently used in the pretrial and remedial stages of litigation, special masters are appointed to make recommendations with regard to facts necessary to find liability.

■ Rule 53(a) provides that "compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of an fund or subject matter of the action, which is in the custody and control of the court as the court may direct...." The compensation of the master is set by the court and allocated between the parties as a cost. *Reid v. Silver,* 354 F.2d 600 (7th Cir.1965); *Carter v. Shop Rite Foods, Inc.,* 503 F.Supp. 680, 691 (1980). *Milwaukee Towne Corp. v. Loew's Inc.,* 139 F.Supp. 809 (1956). There is considerable variation in the standards used by judges to determine the rate of the master's compensation. The Supreme Court has adopted the flexible standard of "liberal but not exorbitant" compensation for masters. *Newton v. Consolidated Gas Co.,* 259 U.S. 101, 103–06, 42 S.Ct. 438, 439, 66 L.Ed. 844 (1922). The Supreme Court in *Newton* also suggested that the salaries of judicial officers performing similar duties can serve as a valuable guide in determining the fees of a master. The Supreme Court further stated that "a higher rate of compensation is generally necessary in order to secure ability and experience in an exacting and temporary employment which often seriously interferes with other undertakings."

Presently, the Court intends to appoint special masters for settlement purposes

only.[14]   Due to the extremely large number of parties involved in this case, the Court will appoint a panel of settlement masters. The court will entertain nominations by parties who wish to nominate additional persons to serve as special masters. The activities of the masters will be coordinated by a Chair. Each defendant will be assigned at least one settlement master.[15]  To add to the effectiveness and efficiency of the settlement master process, the Court encourages, wherever possible, the combination of claims to be submitted to certain masters and will reassign the masters accordingly. The settlement masters will perform their duties, as will be more fully outlined in the order of reference, and will report periodically to the Chair. The Chair will then report to Magistrate Judge Cosbey on a regular basis.

■   The Chair will also set up and maintain a Masters' Reimbursement Fund (the "Fund"). On May 17, 1996, each remaining defendant must pay a fee of $650.00 into the Fund.[16]  Additionally, plaintiffs must pay a fee of $650 *for each remaining defendant.* For example, if the 1,181 original defendants remain in the case on May 17, 1996, plaintiffs' assessment would be $767,650.00 (1,181 × $650.00); if, however, only 429 defendants remain, plaintiffs' assessment would be $278,850.00 (429 × $650.00). The Masters will charge a fee of $150.00 per hour for their services, and they will be paid directly from the Fund. The Chair will also be paid $150.00 per hour for his administration of the Masters Panel. If, at the conclusion of this litigation and after the masters have been paid in full, monies remain in the Fund, such monies will be distributed to the parties on a pro rata basis.

The Chair of the Masters Panel is Frank Gray, who can be contacted at 200 E. Main Street, Fort Wayne, Indiana, 46802; (219) 422–0800. Settlement Master assignments will be given to individual defendants by way of an attachment to their copy of this Case Management Order. This attachment will also be served on plaintiffs' local counsel along with the Notice that the Case Management Order has been served on individual defendants.[17]

## IV.  GENERAL SCHEDULING ORDER RELATING TO ALL PHASES OF THIS CASE

■   To effectively and cost-efficiently utilize both the services of the Special Masters and CLAD, this Court has determined that this litigation will be divided into three separate stages. Stage One, which will last for a considerable period of time in comparison to typical cases, will relate to settlement. This period will be devoted exclusively to efforts

14.  In the future, the Court may consider appointing special masters to perform some other functions, such as making factual findings and/or supervising discovery and reviewing discovery disputes and dispositive motions.

15.  The schedule and deadlines for meeting with the assigned masters is discussed more fully, *infra.*

16.  This $650.00 fee will be used to pay the individual settlement masters for their participation in the settlement conferences and the Chair for his administration of the masters. It is anticipated that this assessment should cover the Masters' fees through the settlement stage. If it does not, additional assessments will be made. If the money in the Fund is not fully utilized, the parties will receive refunds.

The court notes that in comparison to other cases where assessments have been made, the $650.00 fee to be assessed in the present case is modest. *See, e.g., In re San Juan Dupont Plaza Hotel Fire Litigation,* 1989 WL 168401 n. 19, 1988 U.S.Dist. LEXIS 17332 n. 19 (D.P.R.1988)

(noting each member of the plaintiffs' steering committee ("PSC") was ordered initially to pay a fee of $50,000.00 and to contribute an additional $150,000.00). In *San Juan,* each PSC member had contributed $200,000.00 to the discovery expenses plus additional assessments on behalf of their individual clients—$800.00 for each decedent and $300.00 for each injured plaintiff. In *SCA,* the parties were required to pay Liaison Counsel Administrative fees, in most instances totalling $1,000.00 for the first assessment and $2,000.00 for the second assessment. Portions of these assessments were refunded based on the settlement date.

17.  For the past five years, this Court has utilized a court-annexed mediation process as a part of the formal administration of civil litigation. The mediation panel consists of almost 100 attorneys. The members of the panel are highly experienced and have been extremely successful in settling cases which have been filed in this Court. This Court has no doubt that the settlement masters, drawn from this panel, will bring their experience and knowledge to bear in the present case.

to settle individual claims and will involve very minimal costs to the parties in terms of attorney's fees and expenses. The court does not anticipate that CLAD will need to be utilized at this point as responsive pleadings will not be filed until May of 1996, near the conclusion of Stage One. Nor will Special Masters play a role in the case at this early stage.[18]

Stage Two, which will consist of the pretrial phase, will be devoted to discovery, motion practice, and further settlement efforts under the supervision of special masters. It is during this stage that costs, in the form of attorney fees, special master assessments and fees, and expenses could prove to be considerable, albeit less than what would be incurred if traditional methods were utilized. Stage Three will relate to the disposition of this case via dispositive motions and/or trial. The costs to the parties at this stage will obviously be substantial, although such costs are beyond the control of the Court.

The logistics of managing, administering and trying this case will be very complex. In the interests of justice and to promote the just, speedy and fair resolution of this case, the Court finds that this Case Management Order should be entered.

### A. *Preliminary Matters*

#### 1. *Expected Conduct of Attorneys*

Obviously, at this early juncture, it is not known how many lawyers may enter this case. Presumably, however, the number will be large. Given that this litigation could last for some time and that many lawyers will be strangers to each other, with different styles and personalities, this Court is of the view that some cautionary words must be said about what is expected of counsel.

The just and efficient resolution of this case will depend in large part upon the way the attorneys comport themselves and how they overcome conflicts. In this respect,

counsels' attention is drawn to the *Standards for Professional Conduct Within the Seventh Judicial Circuit.* "The added demands and burdens of complex litigation place a premium on professionalism." *MCL,* § 20.21.[19] "An attitude by counsel of cooperation, professional courtesy, and acceptance of the obligations owed as officers of the court is critical to successful management of the litigation." *Id.* "Counsel need to perform their obligations as advocates in a manner that will foster and sustain good working relations among themselves and with the court." *Id.* Thus, cooperation, courtesy and professionalism will be hallmarks throughout this litigation. Failure to abide by these tenets, through negligence or indifference, will result in the certain imposition of sanctions. Counsel are also expected to familiarize themselves with and follow the Local Rules for the Northern District of Indiana.

#### 2. *Sanctions*

"The rules and principles governing the imposition of sanctions are the same in complex litigation as in other litigation, but the potential of sanctions requires careful attention in complex litigation because misconduct may have more severe consequences." *MCL* § 20.151. Counsel are advised that this Court will impose sanctions when warranted, either upon motion or *sua sponte,* to remedy the difficulties or compensate the Court and affected parties for the damage and delay caused. In this respect, counsel are admonished that this and all orders of the Court must be strictly followed and failure to follow any orders shall result in the imposition of sanctions against counsel personally and/or their clients.

In setting forth the foregoing, this Court is fully aware that sanction proceedings can be disruptive and costly. Such proceedings may also create personal antagonism which is inimical to the atmosphere of cooperation

---

18. Of course, the Court by this order is not prohibiting the parties from contacting their assigned master for the purpose of facilitating settlement. However, if contacted and utilized, the parties should be prepared to directly pay the master his or her hourly rate, as the assessment will not yet have been made.

19. The *Manual for Complex Litigation—Third* published by the Federal Judicial Center will be referred to throughout this litigation. Counsel should become familiar with this Manual.

which should permeate this litigation. Accordingly, counsel should avoid moving for sanctions unless all reasonable alternatives have been exhausted.

### 3. *Informal Dispute Resolution*

█ Given that cooperation is a bedrock of this litigation, counsel shall make good faith efforts to resolve all disputes out of Court and in an expeditious manner. Prior to submitting *any* matter to the court, counsel must attempt to resolve the matter informally. Any matter submitted to the Court must contain a certificate indicating that counsel has informally attempted to resolve the dispute. Such a certificate must indicate the date, place and time that counsel attempted to resolve the matter and indicate which counsel participated in the effort. The form of the certificate shall be the same as that required under Local Rule 37.1. Such efforts to informally resolve matters may be conducted in person or via telephone keeping in mind that such efforts must be undertaken in a good faith effort to resolve the dispute.

### 4. *Parties' Designations*

█ In all Motions and Orders, the parties shall be referred to by both their name and their number designation in the initial complaint. Plaintiffs' numbers will include the prefix "P" and defendants' numbers will include the prefix "D". For example, Bob Wysong Chevrolet–Pontiac, Inc. would be referred to as "Bob Wysong Chevrolet–Pontiac, Inc., D–123," and Ontario Corporation would be referred to as "Ontario Corporation, P–13." Parties who are joined or otherwise added from this date forward, and not otherwise enumerated in the Complaint, shall be referred to only by name.

### 5. *Service of Process and Default*

Plaintiffs shall forthwith complete the issuance of summons to all defendants if that has not already been done, and shall effect service as promptly as possible. Plaintiffs shall comply with the service requirements of Rule 4, Federal Rules of Civil Procedure. Whenever it appears that a party is in default by failure to appear or to plead or defend as

required by the Federal Rules or an Order of this Court, plaintiffs shall, within thirty (30) days of that default, move for a default in accordance with Rule 55, Federal Rules of Civil Procedure. Any such motion for default shall be accompanied by an appropriate form of order.

### 6. *Defense Steering Committee*

On or before December 20, 1995, the defendants' counsel shall convene in person for the purpose of appointing a Defense Steering Committee. The Committee shall be composed of five members, including a Chair or Co-chairs. The purpose of the Steering Committee will be for its members to serve as spokespersons for all defendants throughout this litigation. The Chair shall notify the Court of the appointees on or before December 22, 1995.

### 7. *Document Depository*

On or before August 19, 1996 (prior to the beginning of discovery), counsel for plaintiffs and defendants are responsible for creating and maintaining a document depository to function in the same general manner as the document depositories utilized in *SCA*. Such document depository shall be of a suitable size and nature for the purpose of maintaining a document depository and inspection area. The parties shall designate an administrator of the depository who shall be responsible for overseeing the administration of the depository. The parties shall submit a stipulation or proposed order to the court for governance of the depository on or before September 3, 1996.

### B. *The Stages of Litigation*

### 1. *Stage I—The Informal Settlement Phase*

Stage One of this litigation will be devoted exclusively to attempts to resolve, through settlement efforts, claims against the individual defendants. During this period, no responsive pleadings will be filed nor will they be accepted by the Court. Each defendant shall have between May 17, 1996[20] and June

---

**20.** May 17, 1996 is the date on which Stage Two

of this litigation begins. At this point, the Settle-

3, 1996 within which to answer or otherwise respond to plaintiffs' complaint. It is further ORDERED that any answer or responsive pleading attempted to be filed prior to that time shall be REJECTED by the Clerk of this Court and RETURNED WITH A NOTATION THAT IT WAS ATTEMPTED TO BE FILED IN CONTRAVENTION OF THE CASE MANAGEMENT ORDER ENTERED IN THIS CAUSE.

### a. Upon Entry of Appearance

■ Immediately upon the entry of an appearance in this cause,[21] either by counsel or *pro se*, the Clerk of this Court will send to counsel or the *pro se* litigant a copy of this Case Management Order.[22] It is incumbent upon any party or counsel receiving this Case Management Order to fully read and understand this Order since it will serve as the guidebook for this litigation. Within ten (10) days of receiving this Order, counsel shall provide a copy of this Order to their client(s). Within seven (7) days thereafter, counsel shall satisfy themselves that the client has read and understands the contents of this Case Management Order.

In an effort to alleviate excessive and redundant paper in the Court's files and excessive postage and paper for service on plaintiffs, the Clerk of the Court shall file a Notice in the Court's file each time a copy of the Case Management Order is sent to a party and the Clerk shall serve the same notice on plaintiffs' local counsel through his courthouse mailbox in the Clerk's Office.[23]

### b. Verified showing of evidence

■ Within thirty (30) days after the entry of an appearance or any indication that a party will be proceeding *pro se*, plaintiff shall serve upon that party a verified showing setting forth all evidence in support of its claim against that party. The verified showing shall set forth the complete evidentiary basis for the inclusion of the named defendant, and shall include all known information relative to the nature and quantity of waste sent to the subject site. Attached to the verified showing shall be any supporting documentary evidence currently known to and possessed by the plaintiff or a certification that such documentary evidence has already been provided to the defendant.

Within thirty (30) days of receipt of such verified showing, the individual defendant shall serve upon plaintiffs a verified showing setting forth the factual basis for any denial of the contentions set forth in plaintiffs' verified showing. Defendant must also attach any supporting documentary evidence in its possession. *Neither plaintiffs' nor defendants' verified showings, or notice thereof, are to be filed with the Court or served on any other party.* The verified showings shall be deposited in the document depository by August 30, 1996.

### c. Statement of fees and costs

■ At the same time that a defendant files its affidavit or verified showing, defendant's counsel shall serve upon his or her client a statement of the costs and fees ex-

---

ment Masters Assessment fees are due and CLAD filing will begin. *See infra* pp. 289–291.

**21.** The court notes that *attorneys admitted to practice and in good standing in any United States District Court are hereby deemed to be admitted to practice pro hac vice in this litigation.* Thus, for purposes of this litigation only, the Court hereby temporarily suspends this District's Local Rule 83.5(c), insofar as it requires application to the court for leave to appear *pro hac vice*. A motion for leave to appear *pro hac vice* will be returned with a notation that it was attempted to be filed in contravention of this Case Management Order.

**22.** A corporate defendant cannot appear *pro se* and must be represented by counsel. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427 (7th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

**23.** Given the exorbitant distribution costs, this Court has attempted to combine into this order several orders which would normally be distributed throughout the case. For example, an order in the range of 30 pages would cost $1.47 per copy to mail. Currently, there are 1204 parties in this case. Thus, to mail a 30–page order in this case would cost $1,769.88. Assuming that this order could be copied at a rate of $.10 per page, the copying fees would be $3,612.00 (36,-120 pp. × $.10). Therefore, the cost to distribute this Case Management Order will exceed $5,300.00 not including the labor costs involved in collating the document and addressing and filling the envelopes. This should give the parties some indication of how costly it would be to administer this litigation in the traditional manner and the consequent benefits of CLAD.

pected to be incurred in this action. That statement shall consist of two estimates. First, the statement shall include an estimate of the costs and fees expected to be incurred through the informal settlement phase, up to and including the first pretrial conference, scheduled for April 18, 1996. Second, the statement shall contain an estimate of the expected costs and fees to take this case full-term, through trial, and shall specifically delineate the amount expected to be expended for the services of the settlement master.

■ Plaintiffs' counsel likewise have a responsibility to provide cost estimates to their clients. Their responsibility in this regard is twofold. First, within thirty (30) days of the date of entry of this Order, counsel shall provide their clients with an estimate of the overall anticipated costs and fees to take this litigation full-term, through trial. Second, within twenty (20) days of receipt of an individual defendant's affidavit or verified showing, plaintiffs' counsel shall provide their clients with an estimate of the expected costs and fees to be incurred through the informal settlement phase with respect to this individual defendant, up to and including the first pretrial conference. The individual estimates shall additionally include an estimate of the expected costs and fees to take this case full-term, through trial, and shall specifically delineate the amount expected to be expended for the services of the settlement master.

d. Informal settlement conference

■ Within thirty (30) days of service of defendant's counter-affidavit, counsel and the parties shall personally meet in an effort to resolve their dispute. This effort at settlement shall not be *pro forma,* but instead shall be undertaking in a good faith effort to resolve the individual claim.

Within ten (10) days after the initial settlement conference, if a settlement has occurred, the parties shall file with the Court an Agreed Judgment or Stipulation for Dismissal together with an appropriate form of Order for signature by the Court. It is sufficient for this purpose to have at the conclusion of the Agreed Judgment or Stipulation for Dismissal the following:

"SO ORDERED this ___ day of ___, 199_.

——————————— William C. Lee
United States
District Judge"

If, however, a claim is not settled at this initial stage, the parties shall so notify the Chair of the Special Master Panel.

e. First Pretrial Conference

The only formal proceeding that the Court will schedule during the informal settlement period will be the first pretrial conference on April 18, 1996. This conference will be held at the *Grand Wayne Center* at 10:00 a.m. The agenda for this conference is set forth below:

*First Pretrial Conference*

*April 18, 1996*

*AGENDA*

8:30 a.m. Registration

10:00 a.m. Conference with Judge Lee

1. Introduction

2. Possible joinder of additional parties

3. Cross-claims/Counterclaims

4. Anticipated motions

5. Settlement status

6. Other matters to aid the administration of this case

1:30 p.m. CLAD Training

2:45 p.m. Individual settlement conferences—plaintiffs to make themselves continuously available for as long as necessary

Prior to the conference, plaintiffs' counsel and the Chair of the Defense Steering Committee shall meet to discuss the agenda and each shall apprise the Court, in writing, by March 15, 1996, of responses to the agenda items or suggestions of other matters that would be worthwhile addressing at the conference. Plaintiffs' counsels' report should also include the status of service of process and entries of default.

■ The conference begins at 10:00 a.m., but *all parties and counsel must be present at 8:30 in order to register their attendance*

*with the Clerk.* All counsel and a representative of each party with authority to settle shall attend this conference. If counsel cannot attend, they must send other counsel on their client(s)' behalf. Those who do not attend WILL BE SANCTIONED and will be required to attend a supplemental pretrial conference that will be set if necessary.

At the time of the conference, a presentation on CLAD will be given by LEXIS–NEXIS personnel. Counsel may want to consider having in attendance the person or persons who will be utilizing CLAD. Locations will be provided for parties wishing to further discuss settlement informally. Plaintiffs shall make themselves available for as long as any defendant is present and wishes to discuss settlement, during regular business hours, which conceivably could require plaintiffs' attendance through the week of the conference and into the following week. However, the Grand Wayne Center will only be available on April 18, 1996, from 8:00 a.m. to 5:00 p.m., and plaintiffs shall make arrangements to discuss settlement elsewhere in Fort Wayne after this date.

### f.  Monthly telephone conferences

On the first Wednesday of each month, at 8:30 a.m. (Fort Wayne time), beginning January 3, 1996, Magistrate Judge Cosbey will hold a telephone conference with the Defense Steering Committee members and plaintiffs' counsel. The purpose of these conferences is to assess the progress of the litigation and address any concerns that may have arisen. Other parties and counsel may attend these conferences in person.

### g.  No settlement conferences with the Court

It is anticipated that many of the parties to this litigation will take advantage of this window of opportunity to free themselves from what may become expensive and time-consuming litigation. Although the parties are certainly entitled to pursue their positions to the fullest extent, this Court is of the view that this grace period, which will require little in terms of time and costs in compari-

son to full-blown litigation, is in keeping with Rule 1 of the Federal Rules of Civil Procedure.

Once Stage One of this litigation comes to a close, the chances for a cost-efficient settlement will decrease markedly. The parties are put on notice that, contrary to the usual practice of this Court, the United States Magistrate Judge will not conduct settlement conferences with respect to individual claims. The most profitable time for all parties to settle any claim in this case will be before Stage One closes on May 16, 1996.

### 2.  *Stage II—The Pretrial Stage*

For those parties remaining in the case after the close of Stage One, the litigation will enter the pretrial phase. It is here where costs can be expected to increase drastically.

### a.  Master Settlement Conferences

For any claim not settled during Stage One, the parties will be deemed referred to a Settlement Master on May 17, 1996. Each party to this litigation will be assigned a Settlement Master[24] for purposes of further settlement discussions. The Chairperson of the Master Panel is Frank Gray. On May 17, 1996, there shall be due from all defendants still in the litigation a Master Assessment fee of $650.00 and from plaintiffs $650.00 for each remaining defendant, all of which is to be deposited into the Masters' Reimbursement Fund, which shall be an interest-bearing account. This fee is payable within ten (10) days, and checks shall be made payable to "Frank Gray, Special Master" and sent to his address listed above.

By June 17, 1996, the respective parties, in consultation with their Settlement Masters, shall determine a time and date for any further settlement conference. Said conference will be at the Settlement Master's office or at an appropriate place designated by the Settlement Master. The settlement conference before the Settlement Master shall occur before September 3, 1996. By Septem-

---

**24.** Defendants should see Attachment A for their Settlement Master assignment. If the current assignment poses a conflict or potential conflict, contact Frank Gray, Chairperson of the Master Panel, immediately for reassignment.

ber 23, 1996, the Settlement Masters shall submit their individual reports to the Chairperson of the Master Panel, Frank Gray.

At least five (5) days before the scheduled date of the settlement conference, the parties shall provide the Settlement Master with a "Confidential Statement of the Case." That statement is for service only upon the Settlement Master. The "Confidential Statement of the Case" shall concisely and succinctly set forth the party's claim or defense and shall not exceed five (5) pages of typed, double-spaced text on $8\frac{1}{2}'' \times 11''$ paper.

The costs of the Settlement Master shall be borne equally by the parties. That is, one-half shall be charged to the plaintiffs and one-half to the individual defendant or defendants. Parties will be charged $150.00 per hour for the Master's services, which may include preparation time not to exceed one hour per conference.

Within ten days (10) of the Settlement Conference with the Settlement Master, the parties shall inform the Court as to whether the individual claim has been settled. For those that are settled at this stage, an Agreed Judgment or Stipulation for Dismissal shall be filed together with an appropriate form of Order for signature by the Court. It is sufficient for this purpose to have at the conclusion of the Agreed Judgment or Stipulation for Dismissal the following:

"SO ORDERED this ___ day of ___, 199_.

——————————— William C. Lee
United States
District Judge"

If, however, a claim is not settled, the parties need not notify the court.

On or before October 31, 1996, the Chair of the Special Master Committee shall submit to the Court a summary of the individual Special Master settlement reports, which shall then be addressed during the second pretrial conference, to be held on November 13, 1996, at 10:00 a.m.

### b. Pleadings

Between May 17, 1996 and June 3, 1996, answers or other responsive pleadings will be due from all remaining defendants. The Defense Steering Committee is directed to develop master responsive pleading(s) in which parties may join by the filing of a notice.

The filing of any third-party pleadings or cross-claims ARE HEREBY STAYED until further order of the court.

### c. CLAD

Beginning on May 17, 1996, all filings to be made in this cause will not be made with the Clerk of this Court. Instead filing and service will be made utilizing the CLAD.

### d. Discovery and Motions Practice

On September 3, 1996, discovery in this matter shall commence and continue for a period of ten (10) months.[25] On that date, the parties shall make their initial disclosures required by Rule 26(a)(1) of the Federal Rules of Civil Procedure. The parties are specifically exempt from conducting a planning meeting within the meaning of Rule 26(f). Written discovery—to include interrogatories and requests for production of documents—shall be served on opposing parties on or before October 1, 1996. It is contemplated by the court that between May 17, 1996 and September 3, 1996, the plaintiffs and the defendants shall collaborate on discovery and prepare master interrogatories and master requests for production of documents, which shall be completed no later than September 3, 1996. The court will assist the parties in this endeavor by scheduling discovery status conferences shortly after May 17, 1996, and shortly after September 3, 1996. Responses to such written discovery shall be produced on or before November 1, 1996, by delivery to the document depository.

On or before October 2, 1996, all dispositive motions which are apparent to the parties and which do not require discovery shall be filed. Briefs shall be filed on CLAD and in accordance with Local Rule 7.1. To the greatest extent possible, the parties shall

---

**25.** Given the early notice to counsel of the discovery calendar and the fact that the parties are expected to collaborate on discovery matters, the court finds that ten months is an adequate period for discovery.

collaborate and submit joint motions in this regard. On November 13, 1996, the second pretrial conference will be held.

On or before January 6, 1997, experts, within the meaning of Rule 26(a)(2), Federal Rules of Civil Procedure, shall be disclosed. Reports from retained experts shall be served on or before February 21, 1997. Depositions shall be taken between February 10, 1997 and July 1, 1997. Plaintiffs' counsel and the Defense Steering Committee shall collaborate regarding the scheduling and taking of depositions in such a way that, when feasible, deponents shall not be required to be deposed more than once. July 1, 1997 is the last date for the completion of all discovery.

On July 15, 1997, the court will hold a third pretrial conference. On or before August 1, 1997, parties shall file dispositive motions on CLAD for which discovery is necessary. To the greatest extent possible, the parties shall collaborate and submit joint motions in this regard. Local Rule 7.1 shall likewise apply to the briefing of these motions. The final pretrial conference will be held on January 6, 1998.

### Stage III—The Trial

The trial will commence on April 21, 1998. The court will set aside twelve (12) weeks for the trial of this matter.[26] This is merely an estimate, and it may be enlarged or reduced given future events.[27]

### SCHEDULE

December 20, 1995 On or before this date, defense counsel shall meet in person to appoint Defense Steering Committee.

January 3, 1996 Monthly status conferences commence. (To be held the first Wednesday of every month hereafter.)

March 15, 1996 Counsel reports to the court are due.

April 18, 1996 First pretrial conference.

May 17, 1996 Master assessment fees due. CLAD implemented for all remaining parties.

Responsive pleadings can be filed.

June 3, 1996 All responsive pleadings to be filed by this date.

June 17, 1996 All master settlement conferences must be scheduled by this date.

August 19, 1996 On or before this date, document depository to be created.

September 3, 1996 Discovery begins. Master interrogatories and requests for production must be formulated by this date. Master settlement conferences must be held by this date. (Confidential statements are due to the settlement master five (5) days prior to the date of the conference.)

September 23, 1996 Settlement masters shall submit individual reports to Frank Gray, Chair of the Master Panel.

October 1, 1996 Written discovery shall be served on opposing parties on or before this date.

October 2, 1996 On or before this date, all dispositive motions which are apparent to the parties and do not require discovery shall be filed.

October 31, 1996 Frank Gray shall submit a summary of the individual master reports to the Court.

November 1, 1996 Responses to written discovery shall be produced on or before this date.

November 13, 1996 Second pretrial conference.

January 6, 1997 Experts shall be disclosed by this date.

February 10, 1997 Depositions shall be taken from this date until July 1, 1997.

---

**26.** If the trial in this case commences on April 21, 1998 and lasts approximately twelve (12) weeks, this case will have been tried within the three years recommended by Congress in the Civil Justice Reform Act.

**27.** *See, e.g., United States v. Ottati & Goss, Inc.,* 630 F.Supp. 1361 (D.N.H.1985), *and* 694 F.Supp. 977 (D.N.H.1988), *aff'd in part, vacated* *in part, remanded in part,* 900 F.2d 429 (1st Cir.1990), in which the non-jury trial consumed almost 19 months on the first phase (finding liability to perform cleanup or pay costs, or both) and over five additional months in the second phase (determining the costs to be borne by each of 15 responsible parties). 900 F.2d at 431.

February 21, 1997 Reports from retained experts shall be served on or before this date.

July 1, 1997 Discovery ends.

July 15, 1997 Third pretrial conference held.

August 1, 1997 On or before this date, parties shall file dispositive motions for which discovery has been necessary.

January 6, 1998 Final pretrial conference.

April 21, 1998 Trial commences.

NOTE: THIS SCHEDULE CONTAINS ONLY THE MAJOR DATES AND DOES NOT INCLUDE ALL DEADLINES ENUMERATED IN THE ORDER. IF THERE IS A CONFLICT BETWEEN THIS SCHEDULE AND THE ORDER, THE ORDER SHALL GOVERN.